MEMORANDUM OF DECISION
This case presents a petition for the termination of the parental rights of Kristen K., Carlos M. and John S., the putative fathers of Martin K., born March 17, 1992. A few days before his fourth birthday in 1996, Martin was placed in foster care by the Department of Children and Families (hereafter "DCF"). He was adjudicated a neglected and uncared-for child on May 29, 1996. A petition for termination of his parental rights was filed on February 10, 1997. CT Page 2154
The court finds that the mother was personally served with the petition for termination and has appeared through court appointed counsel. Service on Carlos M. was made by publication in The Bronx Press Review, a newspaper with general circulation in the Bronx, New York, as Kristen K. reported that Carlos M. had returned there. As to John S., there was publication in The Boston Globe, a newspaper with circulation in the Boston, Massachusetts area. Kristen reported John lived in Boston; she did not know his address or his date of birth nor could she provide other relevant information to assist in the search for him. No individual has come forward to claim paternity of Martin and no one appeared at trial. The court finds, from the evidence, that proper notice has been given in accordance with the law. No counsel was appointed for the unknown fathers, as to do so would serve no purpose. The court has jurisdiction in this matter and there is no pending action affecting custody of Martin in any other court.
The allegations against Kristen K. are threefold. First, DCF claims that she has abandoned the child. Second, the claim is that this child was previously adjudicated neglected and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. The third claim is that Kristen has no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent child relationship would be detrimental to the best interest of the child. Connecticut General Statutes § 17a-112 (c)(3)(A), (B), and (D). The same grounds are alleged against the putative fathers.
FACTS
The court has heard two days of testimony from the DCF social worker, the court-appointed evaluators, Dr. Sadler and Dr. Mantell, the clinician evaluating Martin's condition at the time of placement and six months thereafter, as well as the child's present therapist. In addition, there were nine exhibits introduced into evidence. The mother did not attend the first day of trial, but was present on the second day and, through her counsel, vigorously contested the petition. The court makes the CT Page 2155 following findings and the reasonable inferences supported by those findings from the evidence presented at trial.
The identity of Martin's father has been consistently kept hidden by Kristen's secretive behavior. Carlos M. is listed on the child's birth certificate as the child's father. Both Carlos, who was living with Kristen when Martin was still in the home, and Kristen deny that he is the father. Kristen claims that their relationship was platonic. Her explanation of the placement of his name on the certificate is that she and Carlos thought that he was a witness, an explanation which the court cannot credit. What is known is that since DCF's involvement with Kristen beginning in 1992, Carlos was present during all home visits and lived with Kristen until some months after Martin's foster care placement, when he disappeared. Paternity testing was ordered during the pendency of the neglect petition in 1996. Neither Kristen nor Carlos cooperated and such testing was never performed. After the summer of 1996, Carlos never contacted DCF concerning Martin and has had no contact with him. As to John S., Kristen has provided no useful information. The court finds that the Department has made reasonable efforts to ascertain the identity of Martin's father and his whereabouts and that DCF was hindered in those efforts by Kristen and Carlos M.
Kristen's secretive behavior has made securing reliable information difficult. Her unwillingness to provide information as well as her unreliability as a historian of those facts which can be verified have hampered the Department's ability to provide her services. What can be pieced together is that Martin was Kristen's first child, born when she was twenty-two. She had by then graduated from high school and attended two years of college. She was not employed. She led a transient life, residing often in motels. She was estranged from her family and socially extremely isolated. In 1992, DCF received its first report about this family concerning domestic violence between Kristen and Carlos. Sporadic referrals continued at yearly intervals about Kristen, Martin and then Mary, born in July of 1995. The record of those referrals reflects that Martin did not receive any medical care after his first birthday. In 1994, neighbors reported strange behavior by the family and were concerned that neither Carlos nor Martin were ever seen outside the apartment for several successive months. Each time, investigation found Martin to be adequately nourished and not suffering from obvious neglect. At the conclusion of each investigation, Kristen refused all services. The most serious referral came in December of 1995, CT Page 2156 when Carlos called for emergency assistance as Mary, then four and one-half months old, had stopped breathing. Her death was later ruled due to SIDS, sudden infant death syndrome, as no other explanation could be found.
Dawn Doty, the Department social worker, testified that she was assigned this matter in September of 1995. At that time, Kristen and Carlos and the children resided in a motel. Kristen was resistant to services and denied that Martin exhibited developmental delays, that the child was under-socialized, not receiving medical care and that the housing was not appropriate. Services offered to her at that time were a developmental assessment of Martin, free pre-school and transportation to pre-school for Martin, housing vouchers and family preservation services. Consistent with her earlier behavior, Kristen refused all services except for family preservation services and housing. After Mary's death, she rejected even those services she had agreed to accept. In December of 1996, the neglect petition was filed after Kristen did not utilize the services provided.
Contact was made with Kristen, Carlos and Martin by a nurse in the early months of 1996 in yet another motel room. On that day, the nurse observed Kristen in bed with another man while Carlos was in the room and Martin present. The authorities had previously been suspicious that Kristen was engaged in prostitution. Soon after, on March 7, 1996, DCF secured an order of temporary custody and Martin was placed in foster care, where he has remained.
After Martin's placement, Kristen and Carlos disappeared. They did not attend any court proceedings and in May of 1996, Martin was committed to the care of the Department. Finally, by the end of June, Kristen called from a shelter to inquire about Martin. At that time, Kristen reported she was four and one-half months pregnant. Because of Martin's behavior in foster care; his failure to ask for his mother, his tantrums and other acting out when his mother was discussed, the Department requested an evaluation before visitation could occur. Also a service agreement was entered into, requiring Kristen to get regular pre-natal care, counseling and to sign releases so that medical information could be shared. All of this, Kristen did not do. She did not attend two court hearings, including one in which her counsel requested visitation with Martin on her behalf. In the fall of 1996, Kristen gave birth to her youngest child, Emmanuel. As Dawn Doty, the DCF case worker stated, "Kristen concentrated CT Page 2157 all her efforts on reuniting with her youngest son, Emmanuel, at the expense of Martin." She took none of the steps required of her to reunite with Martin. As of the date of the trial, she had still not done so, consistently refusing all services offered to her.
Dr. Mantell, the court-appointed psychologist, saw Kristen on October 29, 1996 and again on February 6, 1997. He found her inability to acknowledge any of her problems and difficulties significant. She had:
 "a sense of a person who is perpetually in conflict with authority figures or in struggle with them . . . when demands are made on her that do not fit her own personal and narrow definitions. In this sense, she shows a strong rigidity that impedes reality assessment and required adjustment. This can surely prevent her from asking for assistance when it is needed and making the child-care decisions which would secure her children's health and development."
By the following March, he concluded that:
 "The mother presents in a psychologically impaired condition. She is not able to either intellectually or emotionally relate to the circumstances of her life. Though well compensated and intellectually active and alert, her presentation suggest a serious mental illness with thought-disordered features. Her characteristic secretiveness, rigidity, and impoverished self-report make a definite differential diagnosis difficult."
He testified that she was seriously psychologically impaired and that termination of parental rights was appropriate, as she showed no signs of rehabilitation. He stated that there was nothing that could be done to enhance her general parenting competence as she had no awareness of the problems confronting her.
Dr. Sadler, who met with Kristen for a psychiatric evaluation on April 23, 1997, found that "she shows a well-developed intellectual ability to distort facts for her own self-interest. She shows herself capable of a rather complex and facile ability to alter her own statements in order to attempt to justify her own actions." At trial, he testified that she suffered from a personality disorder not otherwise specified, a diagnosis which CT Page 2158 reflects "a style of functioning that is consistent and stable. She does not consider herself to be ill or to have any problems. This becomes pathological because of the problems it causes in her life and those of her children." He, too, recommended ending her legal relationship with Martin, so that he could be placed permanently with those who could and would care for him.
The seriousness of Kristen's categorical denial of any difficulties in her life becomes appallingly apparent when her son Martin's development is considered. In March of 1996, shortly after his foster care placement, Martin was tested at the Connecticut Children's Hospital and found to be functioning at a two-year-old level, even though he had just turned four. He was not toilet-trained, he did not know how to run or jump, and had poor muscle tone. He had no interpersonal social skills. At the time of his placement, he had bruises on his body, including on the tops of his ears, a sure sign of pinching, a form of physical abuse of children by their caretakers. His teeth showed extreme decay and his immunizations had not been completed.
Martin was tested again just six months later and had recovered from these early losses to a remarkable degree. At that time, he was functioning at a four year old level and had been easily toilet trained. With consistent nurturing in a home which provided for his needs, he flourished. Cathy Gentile-Doyle, the clinical social worker who oversaw the testing, testified that his tremendous progress demonstrated that his "developmental problems were not innate or inherent, but indicated a lack of exposure to skills, concepts and information. He required exposure and opportunities to observe and practice skills appropriate to his age", opportunities never provided by his biological mother and putative father.
During his time in foster care, Martin has slowly disclosed information about his early life with Kristen and Carlos. He initially exhibited an abnormal fear of the bathroom and revealed that he had been made to sleep with a blanket in the bathtub and that he had been locked into bathrooms. He stated that Carlos called him "Buddy" and he called Carlos the same. He said that Buddy did bad things to him and made his mother do those things as well. More recently, Martin had disclosed sexual abuse by Buddy. When evaluated with Kristen and Emmanuel by Dr. Mantell in February 2, 1997, Martin had to be reassured that Buddy would not be present, before he could be persuaded to attend. CT Page 2159
Martin was not evaluated by Dr. Mantell separately in 1997. Nonetheless, Dr. Mantell noted that in the parent-child interaction session, Martin claimed not to know who his mother was. He did not respond to her attempts to reunite with her. During the session, he actively distanced himself from his mother, whom he had not seen in a year. Also troubling was the fact that Kristen was not able to relate to Martin in terms of who Martin was and could not empathize with the child. She consistently treated him as younger than he was and less able to function than his behavior warranted. Kristen was most obviously not his psychological parent. Dr. Mantell stated that "she had an impaired capacity to parent" and he "did not trust her to be unsupervised with a dependent child." When Martin was psychiatrically evaluated by Dr. Carmona of the Child Guidance Clinic a month later in 1997, she found the child to have:
 "made a remarkable recovery in foster placement, and seemed to have recovered from his initially post-traumatic stress disorder syndrome. At this time, some anxiety remains, but if his home remains constant and caring, Martin will probably make a full recovery."
At the present time, according to his therapist, Martin continues to make good progress. He is doing well in kindergarten and with his foster family.
Since his removal from his mother's care, Martin has only seen his mother once, during the assessment by Dr. Mantell in 1997. His mother has not asked for him since December of 1996, and has only once sent a present provided to her by the shelter in which she resided in December of 1996. She has not called DCF to inquire about Martin's progress or well-being. Martin refuses to acknowledge her as his mother and has no connection to her.
ADJUDICATION
The court finds by clear and convincing evidence all three grounds alleged against Kristen K. have been proven by DCF. The first of those grounds, abandonment, focuses on the parent's conduct. In re Michael M., 29 Conn. App. 112,614 A.2d 832 (1992); In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987), In re Kezia M., 33 Conn. App. 12,632 A.2d 1122 (1993). "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no CT Page 2160 concern for the child's welfare." In re Juvenile Appeal(Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). For Kristen, the evidence has shown that she has not pursued visitation with him, does not display love, affection or concern for this child and has abandoned him completely. As to Carlos M., the most likely father of the child, he has not demonstrated any concern about this child. John S. has also not done so, by clear and convincing evidence.
Based on clear and convincing evidence, the court concludes that Kristen has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her child, she could assume a responsible position in the life of this child. Connecticut General Statutes § 17a-112 (c)(3)(B). As of the date of the filing of the termination petition on February 10, 1997, Kristen had not begun the necessary counseling nor sought to make the changes required of her to be able to regularly visit with Martin, let alone be rehabilitated as a parent. Martin was adjudicated neglected on May 29, 1996. He has been in foster care for two years. He simply cannot wait any longer for the rehabilitation of his mother as he has immediate and strong needs for permanency.
Kristen also has no ongoing relationship with Martin. "The question is whether they [the facts] substantiate a finding by clear and convincing evidence that no relationship ever existed between the parent and child, or that the relationship has terminated, without any future hope for its establishment or reestablishment." In re Migdalia M., 6 Conn. App. 194,211, 504 A.2d 532 (1986); In re Juvenile Appeal (84-3),1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984); In re Juvenile Appeal (Anonymous),177 Conn. 648, 670-671, 420 A.2d 875 (1979). That question is clearly answered by the clear and convincing evidence before the court. The relationship between Martin and his biological mother has ended because of her behavior and she has done nothing to re-establish it. There is no reason to believe that there is any future hope for such action on her part, even if Martin were willing to permit her to do so. As to Carlos M. and John S., neither has ever taken any action to either identify himself as the father or to rehabilitate. Neither has a relationship with Martin.
REQUIRED FINDINGS
CT Page 2161
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
1) Appropriate and timely services were offered by the Department of Children and Families, including counseling, educational services, transportation assistance, and housing assistance. Kristen refused to take part in any services on any consistent basis. No services were offered to Carlos M. or to John S., as neither has ever come forward to claim this child.
2) The court finds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. No efforts were made as to Martin's putative fathers as to do so would be futile.
3) The Department entered into reasonable and realistic service agreements in order to reunify the family. None were set for putative fathers, as to do so would be useless acts.
4) The child has strong emotional ties with the foster family who have provided the physical, emotional and educational support this child needs. Martin refuses to acknowledge any ties to his mother, who is not his psychological parent and has only negative memories of Carlos M. and no emotional ties to John S.
5) Finding regarding the age of the child. Martin will be six years old on March 18, 1998 and is now five years and eleven months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (a) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Neither the mother nor the putative father have done anything to adjust their circumstances to make it in the best interests of the child to be returned to them.
7) Finding regarding the prevention of the parents from CT Page 2162 having a meaningful relationship etc. DCF has taken many steps to encourage the mother to have a meaningful relationship with her son and to rehabilitate herself, which she has been unwilling to accomplish. As to Carlos M. and John S., the putative fathers, DCF has taken all reasonable steps to ascertain their identity and whereabouts.
Also required for adjudication is a finding by the court that either the facts warranting the adjudication have existed for more than one year prior to the filing of the petition or that under the totality of the circumstances, it is in the best interests of the child that the time period be waived. Connecticut General Statutes 17a-112 (d)(1). Waiver of the one year requirement is within the court's sound discretion. InRe Romance M., 30 Conn. App. 839, 622 A.2d 1047, appeal dismissed, 229 Conn. 345, 641 A.2d 378 (1993). In ReChristine F, 6 Conn. App. 360 (1986). The waiver is appropriate in this case where the biological mother refuses all services, has by her conduct terminated all contact with her son and where she is not the psychological parent of the child. Waiting for the time required by the general provisions of the statute to pass would serve no purpose and is not in the best interests of Martin, who deserves permanency in his life. Nor would it serve any purpose to wait for his putative fathers, who have never shown an interest in him. The court concludes that it is in Martin's best interests that the one year time requirement be waived and it is so ordered.
DISPOSITION
Martin will be six years old soon. He exhibits the effect of the neglect and abuse by his mother and one of his putative fathers, Carlos M. The degree to which this child has flourished in foster care is compelling evidence of his earlier neglect and his innate resilience. As those treating him testified, his recovery is ongoing and he requires both permanency and a nurturing home, one he cannot have with his biological mother. Based upon the foregoing findings, the court determines that it is in his best interests that their rights to him be terminated. Accordingly, a termination of the parental rights of Kristen K., Carlos M. and John S. to Martin K. is ordered. It is further ordered that the Commissioner of the Department of Children and Families be appointed the statutory parent for Martin for the purpose of securing an adoptive family and a permanent placement for him. The Commissioner shall file with this court no later CT Page 2163 than ninety days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Judge Barbara M. Quinn Child Protection Session